Good morning and welcome to the Ninth Circuit. Before we begin, Judge Tshisuma and I would like to thank Judge Reyes for sitting with us today. It's really a big help for you to be with us and I'm sorry we won't be in person but we'll see you on Friday. Before we start with our older argument cases, we have a number of cases that are submitted I'll do that now. Singh v. Garland 19-73165 will be submitted as of today. Ruben Alberto Arellano Aquino v. Garland 20-71005 will be submitted as of today. Oscar Armando Duenas Escobar v. Garland 20-71044 will be submitted as of today. First case for our argument will be Oakland v. Oakland Raiders. Counsel, are you ready? Mr. Fay, do we have you? Yes, I am here, your honor. Great, and Mr. Asamo? Yes, good morning, your honor. Great, okay. Mr. Fay, you may begin. Yes, thank you, your honor. I'd like to reserve two minutes for rebuttal. Your honor, the city of Oakland is here today seeking what we believe they rightly deserve, which is an opportunity to try the Section 1 claim in this case. In our factually intensive amended complaint, we have set forth facts that put forward a plausible Section 1 claim, and that's all we have to do at this juncture. What governs this case at this juncture is Rule 8, Iqbal and Twombly. Plausible facts supporting a Section 1 case. Sunday ticket tells us there's four elements we need to address. The first is a contract or conspiracy, and we have alleged that in twofold, a twofold contract or conspiracy. First, we have the defendants agreeing to limit supply, and in NCAA, the Supreme Court said that's a paradigm Section 1 violation, to limit supply, limit output. They limit the supply of NFL teams, which impacts this market. The market we're talking about is the market for hosting NFL teams. That's the first agreement. The second agreement is to use that limitation to inflict on the city of Oakland what experts have called the relocation extortion, and we cite economists in our complaint. We limit supply, and then we go to a city like Oakland and say, there's an artificial scarcity of teams to host, so you either have to pay super competitive prices, or you lose your team. Here, the city of Oakland couldn't pay those prices, and so it lost its team, and it's barred from having another team. The restraint of trade comes, it's derivative of the agreements themselves. It's obvious. No, just excuse me. What do you mean by, you just said it's barred from having another team. What do you mean by that? Who's barring them? The NFL, the defendants. The defendants decide whether there's going to be another team, and so what they do, what they did here, was they took the Raiders out of Oakland, and they denied the Raiders, I mean, they denied Oakland any opportunity to host a different NFL team. What is the allegation in the antitrust terms? Are you alleging a group boycott? The group boycott, and as is the case in many group boycotts, it's also a price-fixing scheme, because by limiting supply, they drive up the price, which is exactly what happened both in NCAA and Sunday Ticket. Does the First Amendment complaint allege that Oakland was denied a new expansion franchise? Yes, it does, Your Honor, and it absolutely does, and also, if you understand, if you just go through, again, you know, applying the holistic approach of Sunday Ticket, you can see that the new franchises are not the result of somebody coming to the NFL and saying, I want a team. That's not how it works. Well, let me just, one of the arguments, I think, I read was that the First Amendment complaint did not make that allegation. It did make that allegation. It's in the complaint a number of times, okay? But again, this is a good example, Your Honor. In one of the cases that the defendants like to cite, the Mid-South Grizzlies case that they cited, page 54 of their brief, that's a case where, you know, it goes all the way back to the 80s, and in that case, this team, the Mid-South Grizzlies, was applying to join the NFL. In that case, because the NFL thought it was helpful to their position, they actually say that two of the franchises that were allowed to join the NFL after the merger in the 1960s, the NFL was the initiative for those franchises. They affirmatively say in the Grizzlies case, through an affidavit of the then Commissioner Pete Wiesel, these teams didn't come to us and say, we'd like to join. We went out, we negotiated with the host city, we negotiated for a stadium, and only then did we go looking for a team and an owner for that team. It's a false narrative to say that you can just join the NFL. You can't. The NFL controls the process. They control where the teams go. But why does that matter? You know, you're not alleging NFL is stopping the city of Oakland from creating a new football league, right? You haven't alleged that. So why does it matter whether or not professional football teams from starting and or playing in Oakland? Well, I mean, because the market has dictated that this is it. And again, that's not a violation, as long as they're not preventing the market from from creating a new league. Just because they were most successful, it doesn't mean that, you know, that you have a right to for them to play in your city. We have a right to dictate supply. And right now, supply is dictated by the NFL. And there's no there's no there's no other league. This is it. This is the market. You're saying that us as a court should say to the NFL, you have to have X amount of teams playing? Absolutely not. Absolutely not. We've never said that. What we're saying is, you can't limit the supply of teams for the purpose of any competitive behavior in the hosting market. In the hosting market, there are teams, there are cities, Oakland, St. Louis, San Diego come to mind that want to host a team and can't. In a competitive market, consumer preference drives supply, but not not not in the NFL. That the cities are the consumers for the NFL, but that's not really the case. The consumers are the fans. There's different markets. Products can have different markets. There can be the markets are conflict. If there's a conflict between the fan market and the host city market, which one? I don't think there is here. I think that there are fans in San Diego that would love to have a team. There are fans in St. Louis that would love to have a team, just like those cities would like to host. But these are different markets. There's a market for consuming the football game on TV or going to the game. There's a market for competition among the NFL teams themselves. But there's also a market, and it's a market that the defendants have recognized over time for hosting those cities. And in the hosting market, the market we define in our complaint, the limit limitation on supply means that consumer preference is not dictating supply. And when that happens, as the Supreme Court told us in NCAA, that is a paradigm antitrust violation. What would be the relief that you're seeking? If if how do we enforce a market, a market situation on on the NFL? We take away their that the privilege of the all the teams voting. Well, in our case, we'd seek damages. But if you were going to do that or if we were going to amend our complaint again to seek some sort of injunctive relief. Yes, that there would be dictates. Listen, some as as American Needle recognized, there are some reasons for the defendants to work together. They have to have a schedule. They have to have rules, things like that. But there is absolutely no reason to prevent new franchise. So yes, at some point, it would be listen, you can't just by a vote of three fourths prevent a new NFL team. Counsel, did you allege that they prevented a new franchise? No, because no, and the defendants make that a big part of their case. They say that we have to have identified what we what we refer to in our in our brief as dead bodies, as teams that have come in and asked to join the NFL and have been denied the opportunity. But that's a false narrative. That's a narrative that says the NFL is like a bike riding club. And all you got to do is fill out an application and own a bike. The narrative here and we see it in this Mid-South Grizzly case. You teams don't go to the NFL and ask to join the NFL decides whether there will be a team in the first instance, and then it goes looking for teams. So here we are 12 v six plausibility, plausibility pleading, the NFL is saying we have to identify dead bodies, those dead bodies under the manner in which the NFL operates could not even possibly exist. And yet we have to identify those in order to avoid dismissal at 12 v six makes no sense. And the Supreme Court told us in in pepper versus apple, if something makes no sense, you shouldn't you shouldn't give it anyway. In this context, in the antitrust context, then let me shift gears for a second. Oakland is a non purchaser who's been priced out of the circumstances. Okay, the case that that both the district court and the defendants rely on for this concept is Montreal, Montreal trading, which is a 10th Circuit case. And what the what the court in that case was trying to do was just prevent a plethora of claims by people who had nothing to do with the underlying facts for just come in and say, Oh, well, if there wasn't super competitive pricing, I would have bought too. So when our our situation that would be like the city of San Antonio showing up and saying, you know what, it wasn't for the super competitive pricing that the NFL was demanding for the Raiders, we would have been to in this context, and the 10th Circuit recognizes that, in this context, were that the Raiders were in Oakland, and they had been for years, we were desperately trying to purchase the right or continue to purchase the right to host that. There is no risk of a plethora of claims. Everybody knows what happened here. There were two cities involved. So so what you're what you're saying, then is we should decide antitrust and you can extend the non purchasers in situations where they're already doing business? Is that what yes, which is what the 10th Circuit recognized that if there was a prior track record with the defendants, let me ask you in every case where they're already doing business. Well, what where do we draw the line? You draw the line at our it does this risk a plethora of claims? If I if I recognize standing in this situation, are a bunch of other potential purchasers going to come in? The other thing your honor that you should consider is that in any group boycott or refusal to deal case, there will never be a purchase. Right? I mean, those cases are defined by the concept of being denied the opportunity to purchase. And this is a group boycott case. And in Montreal trading, the defendants never talked about it. But in Montreal trading, there was a refusal to deal claim. And the and the 10th Circuit upheld the dismissal that claim, not because it was a non purchaser, because obviously, in a refusal to deal case, there's always going to be a non purchaser. But because the 10th Circuit said that the plaintiff in that case had failed to allege that it was a specific target of the defendants antitrust behavior. This amended complaint clear that Oakland was a specific target of the defendants antitrust. You'd like to reserve the rest of your time, Mr. Frank? Yes, yes, yes, your honor. Go ahead, counsel. Thank you, your honor. Good morning. The district court was correct in granting defendants motion to dismiss this case for at least three reasons. The complaint failed to allege injury in fact, fairly traceable to the defendants conduct. It did not even allege the constitutional minimum for standing. Beyond that, the complaint failed to allege facts sufficient to establish antitrust standing under section four of the Clayton Act. And the complaint failed to allege antitrust injury, at least with regard to the Raiders departure from Oakland. Procedurally, it's important to recognize that this case began as a complaint about a team leaving. The city's theory was that the defendants violated the antitrust laws when they permitted the Raiders relocation to Las Vegas. And nowhere did the complaint ever alleged that the Raiders did not want to move to Las Vegas. It alleged that the NFL approved the relocation to Las Vegas. And that theory fails because it does not even allege or restrain a parade. It's the opposite. It alleges that the defendants did not restrain trade by attempting to force the Raiders to remain in Oakland, which of course is the fact pattern that was seen in other antitrust cases involving relocation. Let me interrupt just for a second. Sure. Didn't the district court's decision rest in part on its finding that there was a substantial likelihood that the Raiders would have left despite the hypothetical admission of other teams? Yes. Well, Your Honor, with regard to this hypothetical admission of other teams, the district court found that it was entirely speculative that such a team would have played in Oakland or that there was some scenario in which the existence of other teams would have deterred the Raiders from wanting to move to Las Vegas. It's a little different than that. I think if I understand what the finding was by the district court, that there's a substantial likelihood that the Raiders would have left despite the hypothetical admission of other teams. In other words, even if there are other teams out there available to come in, it doesn't matter. The Raiders are going to leave. Well, I think that's correct, Your Honor, but I would say as well, the city's theory seems to be that if there were more teams... I'm asking about the court's underlying... Yes, Your Honor. The decision on the motion to dismiss. Isn't that a complex fact-intensive finding that's really not appropriate in a district court? That there's a substantial likelihood that the Raiders would have left despite the hypothetical admission? I mean, how can a court make that determination based on the contents of a pleading? I think that for even constitutional standing, you have to show causation. You have to show that the alleged conduct gave rise to alleged injury. The conduct here is that the NFL has a requirement that 75% of teams vote to approve the admission of a new team. The harm alleged here is that the city of Oakland does not have a football team in the NFL. There is not enough of a nexus between those two to establish constitutional standing, again, much less the antitrust standing, which I would like to address as well. But with regard to constitutional standing, there are a series of linkages involving the actions of third parties that would be required before that alleged conduct could cause that alleged injury. Among them is that other teams would apply to join the league, would want to play in Oakland, or conversely, that other teams would somehow fill all available markets such that the Raiders would have decided not to relocate to Las Vegas. That is many levels of speculation, and I think without something much more concrete that appears in this complaint, that would not even satisfy the requirements for constitutional standing. And if you'd like, Your Honor, I can further address why it wouldn't be antitrust standing, under Section 4 of the Clayton Act. Counsel, isn't the standard for constitutional standing, whether or not it's plausible, the causation is plausible? And I believe they allege that in a free market system, there would be 42 teams in the NFL, or I guess an expert will find that. So it seems plausible to me if there were 10 extra teams in the NFL, that Oakland would be a prime candidate to receive one. So it does seem plausible that but for the alleged illegal conduct, that they wouldn't sustain that injury. Well, I think, Your Honor, there still would need to be an allegation that a team, the teams would want to join the league. There is a process by which teams can apply to join the league, and the complaint is not alleged. The teams have sought to do that in order to expand the NFL. Yeah. But I think that that allegation is because of the anti-competitive procedures of the NFL that we don't have that many teams. So if we took those procedures away, maybe the 42 teams would exist, and it seems plausible, and Oakland would get one. Well, Your Honor, again, I don't think even, again, because it involves the actions of standing, but it also would not amount to antitrust standing. I'm sorry to interrupt. Of course. Are you arguing that it's not plausible that another team would want to come to Oakland? Not from the allegations of this complaint. And let me add... I don't understand that. Are you arguing that it's not plausible that another team would want to come to Oakland? That's a yes or no. Yes, I'm arguing that. That it's not plausible that another team in the NFL would find the Oakland market to be a desirable market. Is that true? Is that your argument? My argument, Your Honor, is that we have to evaluate the complaint that is before us. Is that your argument? It's a motion to dismiss, Your Honor, so I think the record is what's in the complaint. And what's alleged in this complaint does not make that plausible. And the plaintiffs did not seek leave to amend. This is the only complaint before us. So what I believe in the abstract... What should the complaint have said, then, that would make it plausible that another team would want to come to Oakland? The complaint could have alleged facts about a team seeking admission. It could have alleged facts about a potential ownership group that wanted to play in Oakland. It could have compared Oakland to other markets. But let me add, even then, even if that were in the complaint, I think this is very important, we still would not have antitrust standing under the Clayton Act. And there are several reasons for that. But one of the most important reasons is that the injury is indirect. The excluded team might well have standing. And that is the facts of Mid-South Grizzlies, where a excluded team challenged the restriction. And the courts evaluated that on the merits, not on the standing issue. And that's also the pattern in two cases in this circuit, Seattle Totems and the Decent case versus PGA, where the excluded team or player had standing, but not people who would have done business with that hypothetical team. They are a step, a significant step, removed from the immediately injured party. Counsel, can I ask, what's the difference between the Article 3 inquiry and the antitrust standing inquiry on the causation? Obviously, they're different. One is, so what do you see as the difference? Well, so I think antitrust standing is a number of additional requirements to go beyond constitutional standing. I don't know that the causation aspect of it is necessarily different. But the differences that we see in the Associated General Contractors case, or that are discussed in Judge Tshima's decision in American Ad Management, are that the injury needs to be direct. It needs to be of the type the antitrust laws were intended to prevent. There don't, it needs to not involve undue speculation. There cannot be difficult issues of allocation of damages among different parties. It is a balancing test, although I think one element of it, antitrust injuries, is actually absolutely required. And counsel raised the issue of San Antonio, which actually is a city that the Raiders consider. I don't actually see a meaningful difference here between the standing of that city and of Oakland or of any other city. And it's really not just cities, right? Cities have a, at most, a somewhat vague contractual distinction from the stadium authority. At most, it has a half interest in a stadium, which is not even necessarily the stadium that a team would play in, should a new football team play in Oakland. I think it's undisputed that that stadium is in significant need of repair. So, counsel, do you agree that there is a market for host cities? No, I don't, your honor. The district court found that it was an unorthodox market, but was willing to allow it to proceed beyond the motion to dismiss stage in its ruling. But there's several, there are a lot of issues with that market. What exactly is it that these host provided by a city to a team that, but it is really quite, quite ill-defined. And to the extent a city can make money by having a football team in it, there are lots of other ways a city can make money. If it is, so while football teams may be unique, it's not providing hosting services, whatever that is, to football teams, I don't think is unique, or at least it's not sufficiently alleged in this complaint on which the city chose to stand. Now, why is providing hosting services to NFL teams different from selling computers to NFL teams? We would not say that that was a relevant market of providing a particular set of services to NFL teams, because why is that said in the new cow case, that markets should not be defined by the customers, it should be defined by the products. And here, this market seems to be defined in this complaint by elements of the customer, something special about the customer, the NFL teams, and that's not a proper market. The market needs to be delineated in terms of the products or to let this proceed beyond the 12th and 6th stage. In our view, that is an alternative basis for affirmance. And we certainly argued that in our motions in the district court. Your argument is that the antitrust standing can never extend to purchasers who are priced out of the market. Is that your position? I get your honor to see yes, your standing is based on your position as a purchaser. Because as we know, your consumers and competitors often have standing in antitrust cases because they are market participants, a non purchaser alleging an overcharge should not have standing because there's nothing to compare what they pay to what they they should have paid. So Las Vegas here funded along with the state, in part a stadium for the Raiders. So you can see perhaps, but Oakland did not. Let me ask you a quick question. The 10th Circuit talked about an exception when you have prior dealings. Yes. Are you saying that exception shouldn't apply? Ever? I think that I see that exception applying for instance, if you if you were a purchaser, and then you were then we're talking about a non purchaser who's priced out of the market. Are you saying that that exception that's mentioned in the by the 10th Circuit can never apply to that situation? A non purchaser is priced out of the market? Yes, I think that if standing is is based on your status as a as a consumer, you, you need to be a purchaser and the language in the 10th Circuit talks about somebody with an established course of dealing as as a purchaser, even if perhaps they've now become a non purchaser. So the city of Oakland participated in this market to the extent it is a market in 1995, when it entered when it and other entities entered into arrangements that caused the Raiders to move from Los Angeles to Oakland, but it hasn't participated in in this market since that time. So I think it's a non purchaser under Montreal trading and the Yes, right. The rationale for the 10th Circuit case for this is that they thought that if you had this rule, then there could be an innumerable number of non purchasers that would inundate the company or the market. But in this case, we're just talking about host cities, and there's probably only a handful of potential host cities. So why would that why would this rule apply to this case? I don't think there's any limiting principle there. Your Honor, there are a lot. There are a lot of cities in the United States with population of, of Oakland. But beyond that, again, Oakland is not even the entity that it was directly harmed. That would have been this If we're going to extend standing to people who would have done business in some way with the alleged excluded team, that is a very large expansion of standing, it wouldn't just be cities, it would be businesses within the city that might benefit from the presence of a football team. So I do see that as a significant expansion of antitrust standing that that no court has has said that anybody who would have done business with an excluded participant in the market has standing a complaint of that exclusion. Thank you very much. Thank you, Your Honor. So just a few things. It cannot possibly be the case that a non purchaser that's priced out of a market can never sue an antitrust. Because this court has held that if you destroy somebody's business, by denying them the opportunity to participate in a market, that that plaintiff can recover all the damages associated with the destruction of the business. That's the old case that we cited 29 and 30 of our of our brief. Again, refusal to deal group boycott cases always involves someone who was trying to buy something and was denied the opportunity to do so. And the exception in in Montreal training absolutely applies here. There are two teams, there's no plethora of plaintiff, there's two teams. I'd like to go back to this notion that we were supposed to allege about these teams that were going to join the NFL wanted to join NFL, NFL and the NFL said no. That's why we only have to ledge plausibility here. Because that's a false narrative. The NFL the defendants come here and they tell you that but it's not true. Their own evidence in the mid south grizzly case shows that people don't you don't pay football players and football coaches minimum wage. It's 10s of millions of dollars. People do not put together a football team and then show up at the NFL. The NFL even conceded that they said they went out and established the Seattle and the Tampa Bay franchises and then went looking for them. Finally, this indirect concept is absolutely contrary to the pepper versus apple case which talks about intermediaries. A hypothetical mediary does not exist in the antitrust law. Thank you. Thank you counsel. This case will be submitted.
judges: Tashima, Bumatay, Rayes